# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**AL FATA, BRIAN PHILLIPS and JERRY
J. WALSH,**

        **Plaintiffs,**

**v.**                                    **Case No:   6:14-cv-376-Orl-37DAB**

**PIZZA HUT OF AMERICA, INC.,**

        **Defendant.**

---

## REPORT AND RECOMMENDATION

**TO THE UNITED STATES DISTRICT COURT:**

This cause came on for consideration without oral argument on the following motions[1] filed

herein:

> **MOTION:**   **PLAINTIFFS' UNOPPOSED MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENT, CONDITIONAL CERTIFICATION OF THE SETTLEMENT CLASS, APPOINTMENT OF PLAINTIFFS' COUNSEL AS CLASS COUNSEL, AND APPROVAL OF THE PROPOSED NOTICE OF SETTLEMENT AND CLASS ACTION SETTLEMENT PROCEDURE (Doc. No. 187)**
>
> **FILED:**     **July 5, 2016**
>
> ---
>
> **THEREON** it is **RECOMMENDED** that the motion be **DENIED**.
>
> **MOTION:**     **MOTION TO FILE THIRD AMENDED COMPLAINT (Doc. 197)**

---

[1] The instant motion was also filed, without redactions, under seal (Doc. S-193). This Recommendation applies to both versions of the motion.

**FILED:**          **JULY 20, 2016**

_____

**THEREON** it is **RECOMMENDED** that the motion be **DENIED**.

## I.  BACKGROUND

As set forth in the briefing and supporting papers filed both in the public docket and under seal, Plaintiffs Alfonso Fata ("Fata"), Brian Phillips, and Jerry J. Walsh (collectively "Plaintiffs" or "Class Representatives"), on behalf of a proposed settlement class of delivery drivers in this putative class action, seek an Order preliminarily approving a settlement agreement (Doc. 188-1) with Defendant Pizza Hut of America, LLC ("Defendant" or "Pizza Hut"), granting conditional certification of the class, and for related relief.  As recognized by Judge Dalton in this and the related case,[2] the history of the dispute between Pizza Hut and its delivery drivers is protracted (Doc. 69). For context, the following background is pertinent.

*The Smith Action*

In July 2009, Colorado Plaintiff Mark Smith sued Pizza Hut, Inc., on behalf of himself and "all others similarly situated," alleging violations of the Fair Labor and Standards Act ("FLSA") and the Colorado minimum wage statute. *Smith v. Pizza Hut, Inc.*, No. 09-1632 (D. Colo.) ("*Smith*"). On March 31, 2010, Smith filed an amended complaint that alleged violations of various state law minimum wage statutes, including the Florida Minimum Wage Act ("FMWA") (*Smith,* Doc. 99). The *Smith* court concluded that Mr. Smith "lack[ed] standing to bring claims on behalf of a class under the laws of states where [he] never lived or resided." (*Id.*, Doc. 201). On July 14, 2011, the *Smith* court dismissed the class action as to the state law claims for lack of standing. (*Id.*).

---

[2] *Justin Barkley, Al Fata, Brian Phillips, and Jerry J. Walsh v. Pizza Hut of America, Inc., and Yum! Brands, Inc.*, Case No. 6:14-cv-49-Orl-37DAB (Doc. 69).

*The Hanna I Action*

On October 25, 2011, a class of pizza delivery drivers brought a similar FMWA claim in state court in Brevard County, Florida, against CFL Pizza, a Pizza Hut franchisee. *Hanna v. CFL Pizza, LLC,* No. 05-2011-CA-52949 (Fla. Cir. Ct. 2011). Pizza Hut was named as a defendant on the theory of successor liability (Doc. 84, ¶ 15). CFL Pizza, LLC moved to dismiss, arguing, *inter alia,* that the doctrine of successor liability did not apply (*Id.* ¶ 17). The *Hanna* court agreed and, on June 21, 2012, it dismissed the claims against Pizza Hut and CFL Pizza, LLC "for the time prior to [December 7, 2009] when CFL purchased the restaurants" that employed the plaintiffs (Doc. 1, ¶ 17; Doc. 89, p. 5; Doc. 91, pp. 9–10), indicating that those claims would have to be pursued against Pizza Hut itself (Doc. 23, p. 5). The *Hanna* court later approved a class-wide settlement for the claims against CFL, but not against Defendant Pizza Hut (Doc. 1, ¶ 17).

*The Hanna II Action*

In light of the *Hanna* court's ruling denying successor liability, on July 10, 2012, two members of that settlement class filed an FMWA claim against Pizza Hut in state court in Hillsborough County, seeking to represent a class of delivery drivers. *Hanna v. Pizza Hut of Am., Inc.*, No. 8:12-cv-1863-T-23EAJ, Doc. 2, ¶ 61 (M.D. Fla. Aug. 16, 2012). Then, as Judge Dalton summarizes:

> The case was removed to federal court and assigned to U.S. District Judge Steven D. Merryday.   *See id.*, Doc. 1. Pizza Hut moved to compel arbitration, noting that both of the representative plaintiffs had signed arbitration agreements. *Id.*, Doc. 5. In addition to asking the court to find that there were valid agreements and arbitrable issues, Pizza Hut also sought a ruling that individual arbitration—as opposed to class arbitration—was appropriate. *Id.* Then, presumably to cut Pizza Hut off at the pass, the plaintiffs submitted the action to arbitration. *See id.*, Doc. 9. The plaintiffs submitted to Judge Merryday that the motion to compel arbitration was therefore moot and that the question of individual versus class arbitration was one for the arbitrator, not the court. *Id.* Judge Merryday denied the motion as moot to the extent that it sought arbitration; further, he denied the motion outright to the extent that it sought a ruling on individual versus class arbitration, finding that "[t]he arbitrator must decide whether the arbitration

agreement permits class arbitration." *Id.*, Doc. 11 (citing *Green Tree Fin. Corp. v. Bazzle,* 539 U.S. 444, 452–53 (2003) (plurality op.)). Judge Merryday also stayed the case until the conclusion of the arbitration. *Id.*

(Doc. 69).

The arbitrator assigned concluded that Pizza Hut's arbitration agreement did not permit class arbitration (Doc. 28-5, p. 1). Certain would-be class members then proceeded with individual arbitrations. However, at that time, Pizza Hut could not locate signed arbitration agreements for four of the class members—Plaintiffs Justin Barkley, Al Fata, Brian Phillips, and Jerry Walsh (Doc. 69). The case at bar followed.

*The Instant Action*

On March 7, 2014, Plaintiffs Justin Barkley, Al Fata, Brian Phillips, and Jerry Walsh filed a Complaint in this docket, as representatives of a class virtually identical to the one in Judge Merryday's case. (*See* Doc. 1). In the Complaint, Plaintiffs, on behalf of a purported class of pizza delivery drivers, filed suit against their employer, Pizza Hut of America, Inc., and its parent company, Defendant Yum! Brands, Inc. (Doc. 1). Plaintiffs acknowledged the prior litigation but submitted that they "are not covered" by arbitration agreements (Doc. 1, ¶ 18.)

Defendants subsequently located a signed arbitration agreement for Plaintiff Fata (Doc. 24-7, p. 5.)  On May 18, 2014, Fata filed a motion asking this Court to compel class arbitration (Doc. 23). Pizza Hut then moved to compel individual arbitration as to all Plaintiffs, even those for whom they had not located signed arbitration agreements (Doc. 27).  On August 11, 2014, Judge Dalton denied Fata's motion to compel class arbitration, without prejudice to reasserting it before Judge Merryday; denied Defendants' motion to compel arbitration, without prejudice; and severed Fata's claim from this case and transferred it to Judge Merryday for consideration along with the removed *Hanna II* action (Doc. 69).

On October 16, 2014, Plaintiffs Phillips and Walsh amended the Complaint, removing Fata as a named plaintiff and Yum! Brands, Inc. as a defendant and seeking an expanded statutory period. (Doc. 84). Pizza Hut moved to dismiss claims under the expanded statutory period and filed its Answer with Affirmative Defenses (Docs. 89, 90). Plaintiffs opposed the motion (Doc. 91). On August 21, 2015, Judge Dalton granted the motion as to Plaintiffs' putative class claims, holding that, in accordance with the statute of limitations, the FMWA class claims date back to March 7, 2009 (Doc. 114). Plaintiffs' moved to certify the Order dismissing Plaintiffs' class claims predating March 7, 2009 for interlocutory review (Doc. 115), and the Court denied same on October 15, 2015 (Doc. 126).

In the meantime, on January 28, 2015, the parties jointly moved to stay discovery and other case deadlines in light of a scheduled mediation before Hunter R. Hughes (Doc. 100). The Court granted the motion on January 30, 2015 (Doc. 103). On April 7, 2015, the parties mediated the case for a full day, but were unable to reach an agreement (Doc. 104). The parties arranged for a second mediation, and continued with discovery (Doc. 108). On July 21, 2015, the parties mediated for the second full day, but were unable to reach agreement (Doc. 113).

On October 15, 2015, Plaintiffs Barkley, Phillips, and Walsh moved to certify the class (Doc. 127). Defendants opposed (Doc. 143).  On October 16, 2015, Defendant moved to stay this case pending the U.S. Supreme Court's decision in *Bouaphakeo v. Tyson Foods, Inc.,* 765 F.3d 791 (8th Cir. 2014), *cert. granted*, 576 U.S. --- (June 8, 2015) (No. 15-1156) (Doc. 144). Plaintiffs opposed the motion (Doc. 155).

On November 18, 2015, the parties participated in a third mediation before Mr. Hughes and ultimately reached an agreement to settle the case (Doc. 154).  On November 20, 2015, they informed the Court of the settlement and requested that all case deadlines and rulings on motions be

stayed. *Id.*   On December 2, 2015, the Court denied as moot all pending motions and stayed all deadlines pending consideration of the Parties' proposed settlement (Doc. 158).

On December 28, 2015, in the *Hanna II* case pending before Judge Merryday, Fata filed an unopposed motion to transfer his claim back to the instant docket.   *See* Case No. 6:16-cv-49-37DAB, Doc. 72.   As grounds, Plaintiff cited the class settlement, noting:

> The settlement includes a subclass of individuals who, like Mr. Fata, did sign arbitration agreements but have not yet filed individual arbitration actions. Plaintiffs believe that Mr. Fata will be an excellent subclass representative for drivers who signed arbitration agreements and will respectfully request that he be allowed to serve in that capacity in Plaintiffs' motions for preliminary and final approval in the *Barkley* action. Accordingly, Plaintiffs respectfully request that Mr. Fata's matter be transferred back to Judge Dalton for consideration as part of the *Barkley* settlement.

*Id.* On January 11, 2016, Judge Merryday granted the motion to transfer. Case No. 6:16-cv-49-37DAB, Doc. 73.

On February 1, 2016, in the instant docket, Barkley, Phillips, and Walsh moved for leave to file a Second Amended Complaint that "(a) defines the Settlement Class to consist of 'all Florida delivery drivers Defendant has employed at any time since March 7, 2009,' including without limitation all such Florida drivers employed by Defendant at any time since March 7, 2009 who signed arbitration agreements with Defendant but have not filed any individual arbitration against Defendant as of February 1, 2016; (b) includes a claim under the Fair Labor Standards Act (FLSA) on behalf of all members of the class; (c) withdraws Justin Barkley as a Named Plaintiff; and (d) adds Al Fata as a Named Plaintiff" (Doc. 161).   Plaintiffs excluded from the Class (a) those who have initiated arbitration proceedings against Defendant alleging claims under the FMWA and/or (b) those who were opt-in plaintiffs in *Smith*, and thus, had settled their FLSA claims in that case. *Id.* The date for the class period was adjusted to conform to the Court's ruling on the applicable

statute of limitations. *Id., see also* Doc. 91. The District Court granted leave and the Second Amended Complaint was filed February 2, 2016 (Doc. 163).

On February 5, 2016, Plaintiffs filed their Unopposed Motion for Settlement Preliminary Approval, Conditional Certification of Settlement Class, Appointment of Plaintiffs' Counsel as Class Counsel, and Approval of Proposed Notice of Settlement and Class Action Settlement (Doc. 165). The motion was accompanied by numerous declarations and exhibits, sealed and unsealed. On March 17, 2016, the District Judge referred the motion to the undersigned United States Magistrate Judge and, on March 30, 2016, the Court noticed it for hearing (Doc. 171). In that Notice, the Court advised that:

> Counsel shall be fully prepared to address not only the grounds as set forth in the motion, but the following additional matters:

1. The status of Plaintiff Al Fata's claim in Case No. 6:16cv49-37DAB, the effect of the instant proposed settlement on that claim and suggested disposition of that claim;

2. Why the Plaintiffs are split into two subclasses (given the substantive similarity of their claims) and an explanation for why the two subclasses are treated so disparately with respect to the settlement amount. In particular, the parties should address:

   a. If the claims of the Arbitration Subclass are so weak, why are they recovering anything?
   b. What is the basis for comparing with other similar settlements and litigation/arbitration results?

3. A complete explanation for how the parties arrived at the allocation/settlement terms and why the parties believe it is fair; including:
   a. The rationale behind the methodology and why disparate formulas were used for each subclass.
   b. Why should any residue (due to opt-outs, non-claimants or reduction of fees) go to Defendant rather than Plaintiffs, who are not getting full compensation?
   c. Is the scope of the release overbroad – *e.g.,* "any claim which could have been included in the complaint"?
   d. Clarification with respect to the provisions regarding taxation of payments, interest and penalties.

4. Whether Plaintiffs' counsel can adequately and appropriately represent both the Non-Arbitration Subclass and the Arbitration Subclass, in view of the disparate recovery negotiated for the same alleged wrong;

5. The appropriateness of the attorney's fee and costs provisions, including:

    a. Whether the agreement that "Plaintiffs' Counsel may apply for up to one-third of the Maximum Settlement Amount for attorneys' fees for work already performed and remaining to be performed in the Action and costs and expenses incurred in prosecuting the Action and implementing the terms of the Settlement Agreement" is an agreement that fees *and* costs are capped at no more than one-third of the Maximum Settlement Amount.

    b. Why fees should be based on the maximum recovery rather than the actual recovery.

6. Whether the decision in *Tyson Foods, Inc. v. Bouaphakeo*, 136 S.Ct. ——, 2016 WL 1092414 (U.S. Mar. 22, 2016), cited as a source of uncertainty in the parties' papers, impacts the settlement; and

7. Why should any part of the filings be (or remain) sealed or redacted?

(Doc. 171). The parties filed a Joint Response (Doc. 175) and, on April 20, 2016, the Court heard argument (Doc. 176).   Based on matters raised at the hearing, the Court issued an Order giving the parties until May 20, 2016, in which to supplement or modify their motion with additional argument or evidence, in view of the Court's comments (Doc. 177). Of pertinent note, the Court advised the parties that:

> citation to other cases where settlements have been approved by other courts is not necessarily persuasive unless the issues of concern here were addressed and determined by the other courts. For example, the parties repeatedly rely on the settlement approval order in *Hanna v. CFL Pizza, LLC*, No. 05-2011-CA-52949 (Brev. Cty. Fla.). That order, however, does not provide a detailed analysis on any of the matters raised here and is not of persuasive authority here.
> Moreover, the Court has reviewed the report of D. Paul Regan (Doc. 128-9) referenced by counsel at hearing as providing support for the use of length of employment as a reasonable basis for formulating the settlement. The Court finds that this report does not support or address whether length of employment is a reasonable measure for fair allocation between class members. Indeed, that report identifies other driver employment characteristics which may have equal or greater significance.

(Doc. 177, n. 1).

The parties moved to extend the deadline to supplement their papers (Doc. 180), and an extension until July 1, 2016 was granted (Doc. 181), as were requests to file excess pages and for

certain filings to be redacted or filed under seal (Docs. 182, 183, 185-6).   The instant motion for preliminary approval and related relief, accompanied by numerous declarations and exhibits, was filed on July 5, 2016, and referred to the undersigned. Also, Plaintiffs moved for leave to file a Third Amended Complaint (Doc. 184), which was denied without prejudice (Doc. 196).   The instant renewed motion for leave to amend (Doc. 197) is also before this Court. Upon review of the papers, and for the reasons set forth herein, the Court **respectfully recommends** that both motions be **denied**.

## II.      Standards of Law

The motion seeks preliminary approval of the settlement, conditional certification of the settlement class, appointment of Plaintiffs' counsel as class counsel and approval of the proposed Notice of Settlement and class action settlement procedure. As the papers recognize, before a settlement may be approved, a number of prerequisites must be established. First, the Court must certify the settlement class. Fed. R. Civ. P. 23(c). Second, the Court must determine preliminarily whether the settlement is fair and adequate. Fed. R. Civ. P. 23(e)(2), (e)(1).

Certifying a class action is within a district court's broad discretion, but this authority is not boundless and must be "exercised within the framework of [Federal Rules of Civil Procedure] [R]ule 23." *Klay v. Humana, Inc.,* 382 F.3d 1241, 1251 (11th Cir. 2004) (*quoting Castano v. Am. Tobacco Co.*, 84 F.3d 734, 740 (5th Cir. 1996)), *abrogated in part on other grounds by Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639 (2008). At its core, the class action is meant to "vindicat[e] . . . the rights of groups of people who individually would be without effective strength to bring their opponents into court at all." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 617, 117 S. Ct. 2231, 2248, 138 L. Ed. 2d 689 (1997) (internal quotations omitted).

A putative class implicitly must be "adequately defined and clearly ascertainable." *Little v. T-Mobile USA, Inc.,* 691 F.3d 1302, 1304 (11th Cir. 2012). If it is, a plaintiff must then first satisfy

the prerequisites of Federal Rules of Civil Procedure Rule 23(a) ("Rule 23"), showing: (1) numerosity, (2) commonality, (3) typicality, and (4) adequacy of representation. *See* Fed. R. Civ. P. 23(a)(1)-(4); *see also Amchem*, 521 U.S. at 613. Second, the class action must be one of the types listed in Rule 23(b).[3] The party seeking class certification has the burden of proof. *Valley Drug Co. v. Geneva Pharm., Inc.,* 350 F.3d 1181, 1187 (11th Cir. 2003).

Courts must perform a "rigorous analysis" to ensure that Rule 23's requirements are satisfied before certifying a class. *Gen. Tel. Co. v. Falcon,* 457 U.S. 147, 161, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982). "All else being equal, the presumption is against class certification because class actions are an exception to our constitutional tradition of individual litigation." *Brown v. Electrolux Home Products, Inc.,* 817 F.3d 1225, 1233 (11th Cir. 2016).

As for review of the settlement, at the preliminary approval stage, the Court's task is to evaluate whether the settlement is within the "range of reasonableness" such that class members should be allowed to receive notice and given the opportunity to object or opt out of the settlement.

---

[3] (b) Types of Class Actions. A class action may be maintained if Rule 23(a) is satisfied and if:

(1) prosecuting separate actions by or against individual class members would create a risk of:

(A) inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class; or

(B) adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests;

(2) the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole; or

(3) the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:

(A) the class members' interests in individually controlling the prosecution or defense of separate actions;

(B) the extent and nature of any litigation concerning the controversy already begun by or against class members;

(C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

(D) the likely difficulties in managing a class action.

4 Newberg on Class Actions § 11.26 (5th Ed.) ("Newberg"). "Preliminary approval is appropriate where the proposed settlement is the result of the parties' good faith negotiations, there are no obvious deficiencies and the settlement falls within the range of reason." *Smith v. Wm. Wrigley Jr. Co.,* No. 09-60646, 2010 WL 2401149, at *2 (S.D. Fla. Jun. 15, 2010). "Fairness is determined upon review of both the terms of the settlement agreement and the negotiating process that led to such agreement." *Frank v. Eastman Kodak Co.,* 228 F.R.D. 174, 184 (W.D.N.Y. 2005).   If the court is not satisfied with the proposed settlement, it generally cannot rewrite it, but may only accept or reject it. Newberg §13.12, *citing* MANUAL FOR COMPLEX LIT. (Fourth), §21.61, *see also Holmes v. Cont'l Can Co.,* 706 F.2d 1144, 1160 (11th Cir. 1983) ("Courts are not permitted to modify settlement terms or in any manner to rewrite the agreement reached by the parties").

### III.     The Putative Class and the Settlement Terms

According to the papers, the class consists of approximately 2,250 Florida delivery drivers Defendant has employed for any length of time since March 7, 2009. Excluded are (a) those who have initiated arbitration proceedings against Defendant alleging claims under the FMWA and/or (b) those who were opt-in plaintiffs in *Smith*, and thus, had settled their FMWA claims in that case. The agreement provides that Defendant shall identify the class members based on its payroll and/or other business records as of February 20, 2012. Defendant did not employ any drivers in Florida after February 20, 2012.

As presented by the parties, the class is divided into two subclasses.  According to the Settlement Agreement, class members for whom Pizza Hut was unable to locate a signed arbitration agreement shall be part of the "Non-Arbitration Subclass." Those for whom Pizza Hut was able to find a signed arbitration agreement shall be part of the "Arbitration Subclass." Payments to each subclass differ substantially.

Defendant has agreed to create a settlement fund of up to $3,100,000.00 ("Maximum Settlement Amount"). Settlement Agreement, ¶¶ 14 and 32. The fund will cover settlement payments to Authorized Claimants, Court-approved attorneys' fees and costs in an amount to be determined when Class Counsel applies for attorneys' fees and not to exceed one-third of the Maximum Settlement Amount, Court-approved service payments to the Class Representatives in an amount not to exceed $10,000 each, and the reasonable costs of settlement administration. *Id.* ¶¶ 15, 32 and 33. The Net Settlement Amount, *i.e.,* the Maximum Settlement Amount minus any Court-approved amounts for Class Counsel's fees and costs, the service payments to the Class Representatives, and the costs of administration (including any Taxes and/or Tax Expenses incurred by the Qualified Settlement Fund), is to be allocated between the subclasses as follows: **69.1% to the Non-Arbitration Subclass and 30.9% to Arbitration Subclass**. The settlement payment for each class member shall then be calculated using the following formula:

Net Settlement Amount for Subclass x <u>Total Days Employed for Class Member</u>
Total Days Employed for All Class Members

One hundred percent (100%) of each settlement payment will be treated as a non-taxable payment in reimbursement for incurred expenses and in settlement of claims for alleged interest and penalties.

Settlement class members who do not opt out of the settlement will be deemed to have agreed to, and will be bound by, the following release of claims upon the Effective Date of the Settlement (as those terms are defined in the Settlement Agreement):

> (a) the claims that were or could have been asserted in any civil complaint filed in this case or in any arbitration filed on behalf of any Settlement Class Member before the American Arbitration Association; (b) relate to or arise out of the reimbursement of expenses, under-reimbursement of expenses, or failure to reimburse expenses of any kind; (c) relate to or arise out of the payment of the applicable minimum wage, under-payment of the applicable minimum wage, or failure to pay the applicable minimum wage; and (d) that arise under the Florida Minimum Wage Act (FMWA) and any similar federal, state, municipal or local laws. Without limiting the generality of the foregoing, the claim preclusion effect

of this Settlement, and the judgment thereon, for res judicata purposes shall be co-extensive with the release.

¶ 53.

By signing the Settlement Agreement, the Class Representatives shall release the Released Parties from all claims regardless of nature, known or unknown, whether asserted or not, arising out of any act or omission by the Released Parties prior to the execution of the Settlement Agreement ("General Release"). Settlement Agreement ¶¶ 52-53.

### IV.    Conditional Certification of the Settlement Class

a)  The Class is Ascertainable

"Before a district court may grant a motion for class certification, a plaintiff seeking to represent a proposed class must establish that the proposed class is adequately defined and clearly ascertainable." *Little,* 691 F.3d at 1304 (internal punctuation omitted). Plaintiffs contend that the class meets the first Rule 23 factor in that the class is easily ascertainable from Pizza Hut's own records. For present purposes, the Court agrees that this requirement is met, to the extent the class is defined as the 2,250 Florida delivery drivers Defendant has employed for any length of time since March 7, 2009, subject to the exceptions noted above.

b) The Class is Numerous

As the defined class includes over 2,200 drivers, the requirement of numerosity is also met. *Compare, Kilgo v. Bowman Trans.*, 789 F.2d 859, 878 (11th Cir. 1986) (numerosity satisfied in case where plaintiffs identified "at least" 31 class members).

c)  Commonality and Typicality

"The commonality element is generally satisfied when a plaintiff alleges that 'defendants have engaged in a standardized course of conduct that affects all class members.'" *Bush v. Calloway Consol. Grp. River City, Inc.*, No. 10-841, 2012 WL 1016871, at *6 (M.D. Fla. Mar. 26, 2012). This requirement is also satisfied, with respect to the class, as defined.   As stated in the papers:

common questions of fact and law affecting the Class exist because Plaintiffs allege that they and other members of the Class were *all* under-reimbursed for the miles they drove while performing their delivery duties for Defendant. Some of the specific common questions of fact and law include whether Defendant required Plaintiffs and the Class Members to pay their "out-of-pocket" vehicle maintenance costs; whether Defendant failed to pay Plaintiffs and the Class Members direct wages at or above the applicable minimum wage rate; whether Defendants failed to pay Plaintiffs and the Class Members supplemental wages to offset their vehicle maintenance costs and ensure that they are compensated at or above the required minimum hourly wage; and whether Defendants should be required to pay compensatory damages, interest, and attorneys' fees and costs for violation of the FMWA. *These common issues demonstrate that Class Members are all aggrieved by a common course of conduct, and that their claims are based on the exact same legal theories.*

(Doc. 187, p. 21 – emphasis added).

As for typicality, Plaintiffs represent that their claims "are typical of the Settlement Class for purposes of this settlement because they concern the same alleged pay and reimbursement policies and practices of Defendant, arise from the same legal theories, and allege the same types of harm and entitlement to relief." (Doc. 187, p. 21).

Plaintiffs' contention that each class member is aggrieved by the same conduct in the same way is sufficient to show both commonality of issues and that Plaintiffs' claims are typical of the class, but, as will be seen, is problematic with respect to the disparate relief proposed between the two subclasses.   For present purposes, the Court accepts that *each* delivery driver, regardless of his or her arbitration status, is allegedly aggrieved in an identical fashion.

d) Adequacy of Representation

The fourth prerequisite to class certification requires "that the representative party in a class action must adequately protect the interests of those he purports to represent." *Valley Drug,* 350 F.3d at 1189; Rule 23(a)(4) (internal quotation omitted). The 'adequacy of representation' analysis "encompasses two separate inquiries: (1) whether any substantial conflicts of interest exist between the representatives and the class; and (2) whether the representatives will adequately prosecute the

action." *Valley Drug*, 350 F.3d at 1189 (citation omitted). The requirement applies to both the named plaintiffs and to their counsel. *Kubiak v. S.W. Cowboy, Inc.,* No. 312-CV-1306-J-34JRK, 2014 WL 2625181, at *16 (M.D. Fla. June 12, 2014), *citing London v. Wal–Mart Stores, Inc.,* 340 F.3d 1246, 1253 (11th Cir. 2003). *See also Telecomm Tech. Servs., Inc. v. Siemens Rolm Commc'ns, Inc.*, 172 F.R.D. 532, 544 (N.D.Ga.1997) ("Antagonistic interests are not only those which directly oppose one another, but also are those which may be hostile to one another or unharmonious such that one party's interest may be sacrificed for another's."). As explained below, Plaintiffs showing as to this requirement is lacking.

Plaintiffs contend that their interests and the interests of the members of the Settlement Class are fully aligned in that Plaintiffs are members of the class they seek to represent and share the same claims and interest in obtaining relief as all other class members.   While this might be true if the class were homogenous and all class members were receiving the same measure of relief; here, the parties have split the class into two distinct subclasses, each set to receive markedly different relief for what they insist is the same wrong.[4]   Further, despite the disparate recovery, each sub-class purports to be represented by the same counsel. "An absence of material conflicts of interest between the named plaintiffs and their counsel with other class members is central to adequacy and, in turn, to due process for absent members of the class." *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 959 (9th Cir. 2009). Because some members of the class receive significantly better treatment than others allegedly suffering the same wrong, and the disparate treatment is not adequately supported or justified, the Court has reason to question the adequacy of both the representatives and counsel.

In order to understand the Court's concerns, it is important to understand the "two distinct uses of subclassing: compulsory subclassing for conflicts purposes and permissive subclassing for

---

[4]  The Court considers the settlement in reviewing the showing for class certification, as "[s]ettlement is relevant to a class certification." *Amchem Products*, 521 U.S. at 619, 117 S. Ct. at 2248.

management purposes." Newberg §7:29. Class representatives and counsel cannot represent one class if there are significant conflicts of interest among the class members, but a single significantly conflicted class can be divided into subclasses, each with its own class representative and class counsel, and the class suit may proceed accordingly. *Id.*[5] Here, there is no suggestion that the subclasses presented by the parties was warranted by the complexity of the litigation or other procedural difference (such as geography) sufficient to justify splitting an otherwise homogenous class in two for case management purposes.   Rather, the use of two subclasses is an acknowledgement by Plaintiffs that, despite the claims that "Class Members are all aggrieved by a common course of conduct, and . . . their claims are based on the exact same legal theories," the two groups are, in fact, in conflict. When the reason for the split is divergent interests, each subclass must have its own named class representative and "separate representation to eliminate conflicting interests of counsel." *Ortiz v. Fibreboard Corp.,* 527 U.S. 815, 856, 119 S. Ct. 2295, 2319, 144 L. Ed. 2d 715 (1999).

According to Plaintiffs, all of the delivery drivers were (allegedly) injured in the same way and suffered the same kind of damage from identical conduct.   Despite this, the *measure of damages* for the identical injury varies markedly between each class, based on an "allocation formula" that heavily favors one subclass over the other. As summarized above and set forth in more particular detail in the papers (*see, e.g.,* Doc. 188, n.6), under the settlement, members of the Arbitration Subclass are set to receive approximately 14.5% of their claimed damages while the Non-Arbitration Subclass is to receive 85.8% of their damages.[6] This, despite the fact that during

---

[5] "Where a class is found to include subclasses divergent in interest, the class may be divided correspondingly, and each subclass treated as a class." Advisory Committee note, Fed. R. Civ. P. 23(c)(4).

[6] "This settlement provides an average of $1,352 per driver for members of the Non-Arbitration Subclass (drivers who did not sign arbitration agreements) and $492 for members of the Arbitration Subclass (drivers who signed arbitration agreements)." (Doc. 197, p. 1).

the time period in question the Arbitration Subclass drivers had over two and a half as many deliveries as the Non-Arbitration Subclass, and incurred over $2.5 million more in alleged damages.[7] While the Court will review the "fairness" of the settlement in the next section, the fact that there is such a marked discrepancy in the recovery of one class to the benefit of another strongly suggests unduly preferential treatment that is inconsistent with "adequate" representation from either the representative plaintiffs[8] or counsel.

Once the Plaintiffs and their representatives determined that there should be differentiation between Arbitration and Non-Arbitration drivers, *any* particular allocation of a limited fund for less-than-full compensation, necessarily puts the groups in conflict.

The Court raised this issue with the parties previously, noting that, on its face, the disparate settlement terms were inconsistent with a finding that conflict of interest did not dilute the vigorous advocacy required on behalf of each subclass.   In response, Plaintiffs argue that "counsel abided by all ethical advice and guidelines relating to representing both subclasses, including the Florida Bar Association's guidance indicating that Plaintiffs' counsel are not conflicted from representing both subclasses" (Doc. 187, p. 14).   Plaintiffs also cite to three other settlements where class members

---

[7] According to the motion: During the class period, members of the Non-Arbitration Sub-Class made approximately 978,484 deliveries. Thus, members of the Non-Arbitration Sub-Class were under-reimbursed by approximately $1,643,853.12. Members of the Arbitration Sub-Class performed approximately 2,583,196 deliveries. Thus, they were under-reimbursed by approximately $4,339,770.12. (Doc. 188, n. 6).

[8] In contrast to the lop-sided award for identical alleged misconduct, the settlement allows each named Plaintiff, including Fata – the Plaintiff nominated to represent the arbitration subclass, to apply for Service Payments in an amount not to exceed $10,000.00, and Defendant agrees not to oppose such applications. While such incentive payments are not unusual and, if reasonable, are not, in and of themselves, evidence of conflict with the class, here, the incentive payments are the same for all three Plaintiffs despite the skewed recovery intra-class and the lesser contribution of time and effort by Fata. In this scenario, Fata's incentive to vigorously advocate for a better deal for his subclass may have been impacted by an all but guaranteed *personal* payment equal to the payment the other subclass representatives are set to receive, and roughly *twenty times* what the rest of his subclass will receive. As Judge Byron noted in a similar scenario, "[b]ased on the size of Plaintiff's incentive award in this case compared to the relief obtained for the rest of the class, it would not be unreasonable to conclude that Plaintiff's representation has been compromised." *Palmer v. Dynamic Recovery Sols., LLC,* No. 6:15-CV-59-ORL-40KRS, 2016 WL 2348704, at *11 (M.D. Fla. May 4, 2016) (noting "some courts find that the payment of an inappropriate incentive award in a class action settlement agreement might speak to the plaintiff's inadequacy as class representative under that rule."). While the Court need not reach that conclusion here, it is enough that the papers raise the suspicion, but fail to dispel it.

were represented by the same counsel and payment allocation formulas differed based on whether

the class members signed arbitration agreements: *Hanna v. CFL Pizza, LLC*, No. 05-2011-CA-

52949 (Brev. Cty. Fla. Sept. 3, 2013); *Aper v. Grapevine Imports*, No. 48-195392 (Tex. Dist. Feb.

12, 2004); and *Yim v. Carey Limousine NY, Inc.*, No. 14-5883, 2016 WL 1389598 (E.D.N.Y. Apr.

7, 2016). This showing does not allay the Court's concerns.

Counsel and the mediator confirm (and the Court accepts) that Plaintiffs' attorneys consulted

with The Florida Bar and abided by all guidance provided. While the Court appreciates the ethical

advice counsel received from the Bar, the issue is not whether counsel complied with its ethical

standards. A finding that the dual representation does not amount to misconduct under the ethical

rules is not dispositive of the issue of whether such representation is nonetheless "inadequate" for

class action certification purposes.  The regulatory authority is not charged with reviewing the

existence and impact of a conflict in the context of certifying a class and the Court has not ceded its

authority to determine the adequacy of counsel's representation of a class to the Bar.

As for the three cases cited by counsel, the Court finds none persuasive.

As the undersigned earlier noted (Doc. 177, n.1), the settlement approval order in *Hanna*

does not provide any specifics regarding that settlement nor any discussion or detailed analysis on

the matters raised here, including possible conflicts between the subclasses. As such, it is of limited

utility.

With respect to *Aper,* the parties have not tendered to the Court the state court order they

reference and it does not appear to be published.  Nonetheless, according to the Plaintiffs' Brief in

Support of Final Approval of Class Action Settlement filed in that case,[9] *Aper* is readily

---

[9] Plaintiffs' Brief in Support of Final Approval of Class Action Settlement, *Aper v. Grapevine Imports,* No. 48-195392 (Tex. Dist. Feb. 24, 2004), 2004 WL 3393535.

distinguishable in that, unlike the instant case, the two *Aper* subclasses did not suffer identical harm

and the disparity of recovery was not so glaring:

> The cash consideration proposed in the settlement confers substantial benefits upon the class, particularly when compared to the amount of the Consumer Services Fee.  The fee charged was either $119 or $149, depending when the vehicle was purchased.  *The vast majority of the Arbitration Sub-Class was charged a $119 fee and the vast majority of the Non-Arbitration Sub-Class was charged $149.*  The proposed cash consideration of $50 to the Arbitration Sub-Class and $75 to the Non-Arbitration Sub-class recovers a relatively large percentage of the charged fee. The higher percentage consideration to the Non-Arbitration Sub-Class is justified by the litigation risk associated with the Arbitration Provision.

2004 WL 3393535 *3 (emphasis added). As is clear, the arbitration subclass in *Aper* was damaged

less and is receiving less, namely 42% of its *lesser* claimed damages, while the non-arbitration

subclass is receiving 50.33%, making the discount for the "litigation risk associated with the

Arbitration Provision," less than 8%. By comparison, each class member here is alleged to have the

same basic measure of damages – "under Plaintiffs' theory, the drivers would have been under-

reimbursed by approximately $1.68 per delivery" (Doc.187, n.9), yet the Arbitration Subclass is due

to recover approximately 14.5% of their alleged reimbursement damages, while the Non-Arbitration

Subclass would recover 85.8% -- a difference of over ***71%***. To the extent Plaintiffs' cite *Aper* to

support their position, it has had the opposite effect.

Plaintiffs fare no better with their reliance on *Yim.* According to the papers of record in that

docket, *Yim* was a wage and hour class and collective action brought under New York and federal

law by limousine drivers against Carey Limousine, NY, Inc. and Carey International, Inc. ("Carey

NY"). *Yim v. Carey Limousine NY, Inc.*, No. 14-5883 (E.D.N.Y.) The *Yim* Plaintiffs contended that

Carey NY misclassified the drivers as independent contractors, instead of paying them as non-

exempt employees.  A review of the underlying facts of *Yim* does not establish that the claims of

all of the *Yim* drivers "concern the *same* alleged pay and reimbursement policies and practices of

Defendant, arise from the same legal theories, and *allege the same types of harm and entitlement to relief*" (Doc. 187 in the instant docket, p. 21-emphasis added). According to the Unopposed Motion for Preliminary Approval of Class Action Settlement filed in *Yim*:

> The Class Members will be classified in one of three subclasses: Drivers with three-year contracts with Carey NY (Subclass A), Drivers with five year contracts or inactive long-term (or inactive "no-term") contracts (Subclass B), and Drivers with active long-term or active "no-term" contracts (Subclass C). Schwartz Decl., Exh. 1 at §§ 1.38-1.40. As noted above, Drivers in Subclass A will be allocated a payment of $2,000. Id. at § 2.3.2. Drivers in Subclass B will be allocated a payment of $4,500—they will receive $2,000 if they do not opt out, and $2,500 more if they exercise their opportunity to sign the new IO contract. Id. at §§ 2.3.3-2.3.4. Drivers in Subclass C will receive approximately $19,972 each—$5,000 if they do not opt out, and the rest if they sign the new contract. Id. at § 2.3.5.
>
> This allocation reflects an equitable distribution of the fund in accordance with the contracts the Plaintiffs have with Carey NY, and the strength of those Drivers' claims against Carey NY, as evaluated by Plaintiffs' counsel. Schwartz Decl. ¶ 7. *The Drivers in Subclass A already have contracts which, on paper, assured them of many of the rights of independent contractors.* Id. They had signed individual arbitration agreements (i.e., with class waivers), *and most already signed releases of claims against Carey NY*—making their claims much weaker than those of Subclasses B or C. Id.
>
> Those drivers in Subclass B may have contracts that may contain arbitration class waivers. Id. *Members of Subclass B who have standard five-year term agreements are subject to terms that are far less restrictive than those of Drivers in Subclass C,* such as: freedom to set their own work schedules (Schwartz Decl., Exh. 6, Old Carey NY Five-Year Term Contract, at § I.A.2); freedom to decline particular jobs (id.); freedom to perform driving service to non-Carey individuals or companies (id. at § I.A.7); freedom to purchase their cars through any seller (id. at §§ I.B.1, I.B.4); freedom to assign interests in their contact at a price of their choosing (id. at V).
>
> *The Drivers in Subclass C had no arbitration agreements, had contracts that Plaintiffs would argue are much more restrictive* (and, Plaintiffs would argue, more akin to employment contracts, as detailed above), and must therefore receive proportionally more compensation for their stronger claims. See id.

*Yim v. Carey Limousine NY, Inc.*, No. 14-5883 (E.D.N.Y.) (Doc. 42, pp. 7-8-emphasis added). The subclasses in *Yim* were clearly not similarly situated with respect to the impact of any illegal

practices and the differences go well beyond just the existence of an arbitration clause.[10] Indeed, the *Yim* settlement provided incentives to some of the plaintiffs: "[t]o encourage all of the Drivers to sign the new agreements, which are designed to memorialize a legitimate independent contractor model . . . Carey NY will pay additional compensation to Drivers in Subclasses B and C who sign them." *Id.* As recognized by the reviewing *Yim* court:

> The proposed settlement creates a common fund of $2.1 million, which will compensate a class of 259 members for their claims, will provide enhanced payments to named Plaintiffs for the additional risk they undertook, and will cover attorneys' fees, costs, and administration fees. Schwartz Decl. ¶¶ 4, 9. The settlement appears to be distributed fairly to the various subclasses *by taking into account their respective contract terms.* See id. ¶ 7. Furthermore, Plaintiffs face the risk of liability and damages at trial because of unsettled legal and factual issues that could be determined against Plaintiffs.

*Yim v. Carey Limousine NY, Inc.,* No. 14CV5883WFKJO, 2016 WL 1389598, at *4 (E.D.N.Y. Apr. 7, 2016) (emphasis added). While the *Yim* court did note that "the presence of an arbitration clause in the contracts of certain class members" was a "factor that would reasonably affect the recovery of class members" 2016 WL 1389598, at *5, in view of the complex factual scenario presented in *Yim,* it is inaccurate to imply that the distributions were solely based on the existence of an arbitration agreement. At best, *Yim* stands for the proposition that the existence of such a clause is a factor which the parties can consider in crafting a settlement.  It does not, however, directly address the Court's concern here; namely, the inherent conflict between the subclasses regarding the *weight* (if any) to be given to this factor, and whether that conflict warrants separate representation of each subclass.

---

[10]  Plaintiffs' characterization of *Yim* as being "squarely on point" is odd, given that the stated basis of sub-classification in that case was *not,* as here, the existence of an arbitration agreement, but the length of the contracts and restrictiveness of the contract terms, as set forth above.   Moreover, in view of the numerous differences among the three *Yim* subclasses, the case is not a valid comparator here.

Counsel argues that case law allows class counsel to represent subclasses that received different recoveries, noting:

> "As the Second Circuit explained:
>
>> All class settlements value some claims more highly than others, based on their perceived merits, and strike compromises based on probabilistic assessments. *See, e.g.*, *Weinberger v. Kendrick*, 698 F.2d 61, 78 (2d Cir. 1982) (approving settlement that paid more for federal claims than for state law claims, finding that state law claims were less valuable because they would have been more difficult to prove in court, and "that it was not unfair for the settlement's distribution formula to reflect this"). If these types of compromises automatically created subclasses that required separate representation, the class action procedure would become even more cumbersome than it already is, and would create even more transaction costs in the form of legal fees.
>
> *Charron v. Wiener*, 731 F.3d 241, 253-54 (2d Cir. 2013)."

(Doc. 187, p. 36).   The Second Circuit, however, recently distinguished *Charron,* explaining:

> Of course we have blessed multi-class settlements that were the product of unitary representation, but those were entered into *after* class certification. For example, we approved a settlement negotiated by unitary counsel in *Charron*; but before doing so, we "note[d] that unlike the situation in *Amchem, Ortiz,* and *Literary Works*, the settlement here was not being approved at the same time that the class was being certified." *Charron*, 731 F.3d at 250. Accordingly, we were more skeptical of allegations that subclass conflicts required separate representation. *Id*. True, *Charron* observed "[a]ll class settlements value some claims more highly than others, based on their perceived merits, and strike compromises based on probabilistic assessments," *id*., but that observation has less force in the settlement-only context. *Charron* also spoke of counsel trading one *claim* for another (which may be permissible); in the settlement-only class action, we are concerned that counsel will trade the interests of one *class* for another (which is not).

*In re Payment Card Interchange Fee and Merchant Discount Antitrust Lit.,* -- F. 3d --, 2016 WL 3563719 at *8 (2d Cir. June 30, 2016) (finding a "fundamental conflict" between subclasses, holding class plaintiffs were inadequately represented, vacating certification of the class action and reversing approval of the settlement). Here, too, the instant settlement was not one entered into *after* class

certification and the terms of the settlement raise a legitimate concern that counsel may have

"trade[d] the interests of one class for another."

Put simply, the Court has no basis to judge the fairness of a settlement that, as here, favors

one subclass over another absent assurances of adequate, *independent* representation of each

subclass. This is so even where the claims of one subclass are objectively weaker than another.

Another Second Circuit case succinctly illustrates the point:

> The problem, of course, is that we have no basis for assessing whether the discount applied to Category C's recovery appropriately reflects that weakness. We know that Category C claims are worth less than the registered claims, but not by how much. Nor can we know this, in the absence of independent representation. The Supreme Court counseled in *Ortiz* that subclasses may be necessary when categories of claims have different settlement values. The rationale is simple: **how can the value of any subgroup of claims be properly assessed without independent counsel pressing its most compelling case?** It is for this reason that the participation of impartial mediators and institutional plaintiffs does not compensate for the absence of independent representation.

*In re Literary Works in Electronic Databases Copyright Litigation,* 654 F.3d 242, 253 (2d Cir. 2011)

(emphasis added).   While the Court has no reason to doubt counsel's experience, ethics or

qualifications with respect to handling class actions, the motion does not set forth a sufficient basis

to find one firm adequate to represent both subclasses here.

"A district court that has doubts about whether the requirements of Rule 23 have been met

should refuse certification until they have been met." *Brown,* 817 F.3d at 1233-34 (internal

quotations omitted). On the showing made here, the Court cannot find that Plaintiffs have met the

Rule 23 requirement of adequacy. As such, it is **respectfully recommended** that the motion to

conditionally certify the settlement class be **denied.**[11]

---

[11]   Although this conclusion ends the Rule 23(a) analysis and is dispositive of the issue at bar, for the sake of completion, the Court acknowledges that the parties have met the secondary requirement of showing that the action is maintainable under Rule 23(b).

## V.        Approval of the Settlement

Although the above analysis renders review for preliminary approval of the settlement superfluous, the same concerns that compel the Court to recommend denial of conditional certification support a similar denial of settlement approval.

Judge Byron recently summarized the appropriate framework:

A district court should only approve a class action settlement if it is "fair, adequate and reasonable and is not the product of collusion between the parties." *Saccoccio v. JP Morgan Chase Bank, N.A.*, 297 F.R.D. 683, 691 (S.D. Fla. 2014) (quoting *Bennett v. Behring Corp.*, 737 F.2d 982, 986 (11th Cir. 1984)). The Eleventh Circuit has enumerated six factors a district court should consider in evaluating the fairness, adequacy, and reasonableness of a class action settlement: (1) the plaintiff's likelihood of success on the merits, (2) the range of the plaintiff's possible recovery, (3) the point within the range of possible recovery at which settlement is fair, adequate, and reasonable, (4) the expected complexity, cost, and duration of litigation, (5) any opposition to the proposed settlement, and (6) the stage of the litigation at which settlement was reached. *Faught v. Am. Home Shield Corp.*, 668 F.3d 1233, 1240 (11th Cir. 2011). While these six factors are helpful in answering the fairness inquiry, they are neither determinative nor exhaustive, and the court may consider other relevant factors based on the particular nuances of the case and the settlement proposed. *Officers for Justice v. Civil Serv. Comm'n of S.F.*, 688 F.2d 615, 625 (9th Cir. 1982), *cert. denied*, 459 U.S. 1217 (1983). Additional factors warranting consideration may include (7) an unjustifiably burdensome claims procedure, (8) unduly preferential treatment of the class representative, (9) the terms of settlement in similar cases, (10) an unreasonably high award of attorney's fees to prevailing class counsel, and (11) impermissibly broad releases of liability. *See In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 946–47 (9th Cir. 2011); *In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 317, 323–24 (3d Cir. 1998), *cert. denied*, 525 U.S. 1114 (1999); MANUAL FOR COMPLEX LITIGATION (FOURTH) § 21.62 (2004). [footnote omitted]

Although class action settlements should be reviewed with deference to the strong judicial policy favoring settlement, the court must not approve a settlement merely because the parties agree to its terms. *Redman v. RadioShack Corp.*, 768 F.3d 622, 629 (7th Cir. 2014), *cert. denied*, 135 S. Ct. 1429 (2015); *Holmes v. Cont'l Can Co.*, 706 F.2d 1144, 1150 (11th Cir. 1983) (finding that reliance on the recommendations of the parties and their counsel "fosters rubber stamping by the court rather than the careful scrutiny which is essential in judicial approval of class action settlements"). This maxim particularly holds true in the context of precertification settlement, where the parties' speedy and seamless resolution of their dispute should prompt the court to consider whether the proposed settlement represents a bona fide end to the adversarial process or the collusive exploitation

of the class action mechanism to the detriment of absent class members. *See Lane v. Facebook, Inc.*, 696 F.3d 811, 819 (9th Cir. 2012), *cert. denied*, 134 S. Ct. 8 (2013). In these circumstances, the court must employ "a higher degree of scrutiny in assessing [a settlement's] fairness." *D'Amato v. Deutsche Bank*, 236 F.3d 78, 85 (2d Cir. 2001). Ultimately, the proponents of a settlement bear the burden of proving its fairness, adequacy, and reasonableness. *Faught*, 668 F.3d at 1239.

*Palmer v. Dynamic Recovery Sols., LLC*, No. 6:15-CV-59-ORL-40KRS, 2016 WL 2348704, at *2-3 (M.D. Fla. May 4, 2016).

A full discussion of each factor is problematic here, as this Report will be filed in the public docket and much of the motion and supporting papers have been filed under seal.   Nonetheless, for present purposes, the Court concludes that, as shown above, the absence of independent representation impairs the ability of the Court to adequately evaluate the settlement as to its fairness, adequacy or reasonableness.

As noted, the settlement provides for a split of a set amount between two subclasses, and the split is far larger for the Non-Arbitration subclass.[12]  The preferential treatment of one subclass over (and to the detriment of)[13] the other raises an inference of unfairness. *Holmes,* 706 F.2d at 1148 ("Although there is no rule that settlements benefit all class members equally . . . a disparate distribution favoring the named plaintiffs requires careful judicial scrutiny into whether the settlement allocation is fair to the absent members of the class" and "[c]ourts have refused to approve settlements on the ground that a disparity in benefits evidenced either substantive unfairness or inadequate representation.") (internal citation omitted). *See* Newberg § 13.59 (differential treatment is a warning that the settlement deserves greater judicial scrutiny).

---

[12]  That is not to say the split necessarily "favors" the Non-Arbitration subclass. Based on counsel's description of the impediments to recovery, it may well be that the Arbitration subclass is getting too large a share, at the expense of the other subclass.

[13]  Obviously, in view of a finite Maximum Settlement Amount pie, the bigger the slice for one party, the less available for another.

"The inference of unfairness may be rebutted by a factual showing that the higher allocations to certain parties are rationally based on legitimate considerations." *Holmes,* 706 F. 2d at 1148. Here, Plaintiffs attempt to rebut the inference by pointing to the existence of an arbitration agreement.  Plaintiffs argue that Pizza Hut's arbitration agreement "plainly constitutes a unique defense to class proceedings that applies only to members of the Arbitration Subclass" and "it is therefore rational to award less money to members of the Arbitration Subclass because those members were less likely to prevail on class certification than members of the Non-Arbitration Subclass and because they faced higher hurdles than drivers who were able to access the Court system." (Doc. 187, p. 34).   The difficulty with this premise for the Court is the assumption that a defense *to class proceedings* is necessarily a defense *to the underlying claim.*   In the Court's view, it is not. Even if the existence of arbitration clauses are treated as a legitimate consideration for reducing compensation for the drivers' claims, there is nothing in this record supporting the particular quantification presented here.

In *Parker v. TimeWarner Entertainment Corp.,* 239 F.R.D. 318 (E.D.N.Y. 2007), the court declined to certify a settlement class which including subclasses of plaintiffs with identical claims, but other differences. As explained by that court:

> Objectors contend that the Category III members are treated unfairly by the Proposed Settlement because they receive a differential settlement benefit, *despite holding precisely the same claims as those of Category I & II class members.* All three categories are people whose names appear on the January 1999 LSDB. They share precisely the same risk that their information was sold. They are differentiated only by two characteristics-whether they are current or former subscribers, and whether they live in or outside an area currently serviced by Time Warner. *These differences have absolutely nothing to do with the merits of their claims.* There is absolutely no way to rationally distinguish between the claims of these three categories of plaintiffs. Indeed, the Plaintiffs and Defendants fail to offer any other difference between Category I, II & III claimants that would justify providing Category III claimants with only the mere right to transfer their benefit to someone else. Even if the right to transfer a benefit is a benefit, it is clearly less valuable than the benefit itself. The inference that they are distinguished only because of either the cost that Defendants would incur in compensating them or

the value that Defendants would receive from providing them a benefit-or both-is unshakeable. *A class settlement may not arbitrarily distinguish between similarly situated plaintiffs simply because it might cost more to compensate them than others.*

*Parker v. Time Warner Entm't Co., L.P.*, 239 F.R.D. 318, 340 (E.D.N.Y. 2007) (emphasis added). Here, too, the parties have identified no difference in the *claims,* only a sole difference in the route to compensation. Plaintiffs fail to show that this distinction is enough to warrant the wildly divergent recoveries proposed.

In Plaintiffs' view, because the members of the Arbitration subclass are less likely to be able to prosecute their claims collectively, this *ipso facto* means that their claims are less valuable, because claimants rarely file individual arbitration cases to obtain relief.   The Court is not convinced that this assertion, assumed to be true, is worth the tremendous discount presented.   After all, the percentage of employees who pursue a wage and hour claim in *court* is also slight. Indeed, even given the ability to proceed collectively under the Fair Labor Standards Act, the vast majority of FLSA actions in this district involve only one or two opt-in Plaintiffs. Thus, the implicit contention that "something is better than nothing as these people won't pursue their claim anyway" is not unique to the Arbitration subclass.   Moreover, in view of the fact that the percentage of class members who opt out of a class action settlement is likely to be even smaller, this is not enough to satisfy the Court's review responsibilities to absent class members whose FMWA claims *and* FLSA claims will be foreclosed by the release.   Put simply, Plaintiffs fail to show that the forum alone makes the claims of the Arbitration Subclass *71% less valuable.* As noted above, it may also be even this small recovery for the Arbitration subclass is too large. The parties have failed to provide any basis for the Court to evaluate the fairness of the proposal.

As indicated above, the Court raised this issue previously with the parties, directing them to provide "a complete explanation for how the parties arrived at the allocation/settlement terms"

including "the rationale behind the methodology and why disparate formulas were used for each subclass."(Doc. 171). In response, the parties maintain that "they have conferred in good faith and modified the settlement agreement to more precisely calculate damages by tying class members' shares to days employed instead of weeks worked. See Settlement Agreement ¶ 38(c)." (Doc. 187, p. 13). This does not address the Court's concern.

As summarized above, according to the papers, the Net Settlement Amount "shall be allocated between the subclasses as follows: 69.1% to the Non-Arbitration Subclass and 30.9% to Arbitration Subclass."   While Plaintiffs offer the existence of the arbitration clause as a reason for that subclass to receive *less,* they offer no rationale or justification for the *specific* 69/31 split tendered here.   The absence of any explanation is especially notable, given that "some members of the Non-Arbitration Sub-Class received wages above the minimum" so their under-reimbursement damages "would have been reduced via off-set by the wages paid above the minimum to class members" (Doc. 187, fn. 9).   While higher allocations to certain parties can be reasonable, if they are rationally based on legitimate considerations, this does not mean that *any* legitimate distinction can justify *every* disproportionate allocation.   Put another way, reasonableness in this context means a two-prong showing that: 1) it is appropriate to make an unequal distribution and 2) *this* unequal distribution is appropriate. The second prong is absent here.

Plaintiffs attempt to show reasonableness by pointing to several cases where delivery drivers received less than the recovery proposed here, and contending that this "is the best result in any delivery driver class action and exceeds the results negotiated in many similar court-approved settlements."   The cases cited, however, are readily distinguishable.

In *Perrin v. Papa John's Int'l, Inc.*, No. 09-1335, Doc. Nos. 449, 454 (E.D. Mo. Jan. 12, 2016*),* which Plaintiffs describe as a "virtually identical delivery driver under-reimbursement case," that court determined that $399 per driver was a reasonable per driver recovery in a reversionary

common fund settlement under the laws of several states, as well as the FLSA.   A closer look at that settlement, however, shows that it provided that "[e]ach Settlement Class Member will be allocated a pro rata portion of the Net Settlement Fund   . . . based, in part, on an average store delivery distance computed from delivery records and store addresses" (Doc. 449 in that docket). The "pro rata share" was determined by aggregate damages for the business mileage rate calculations for all Settlement Class Members (subject to the mileage adjustments) divided by the Net Settlement Fund (Doc. 439-1 in that docket). There are no subclasses which are allocated less than their portion, as here. The Court does not see how this is anywhere near identical.

Nor are the other cases Plaintiffs cite persuasive. *Scott v. Bimbo Bakeries, USA, Inc.,* No. 10-3154 (E.D. Pa. Mar. 5, 2014) was a collective action under FLSA, not a class action. *Bodon v. Domino's Pizza, LLC,* No. 09-CV-2941 SLT, 2014 WL 3605507 (E.D.N.Y. June 25, 2014), *report and recommendation adopted sub nom. Bodon v. Domino's Pizza, Inc.,* No. 1:09-CV-02941-SLT, 2014 WL 3566076 (E.D.N.Y. July 18, 2014) involved allegations of failure to provide services or allowances to employees for the laundering, cleaning, and maintenance of work uniforms; de facto deductions from employees' wages by requiring them to make certain uniform-related purchases; and retention of gratuities belonging to delivery drivers. This is not "similar" wrongdoing. Finally, *Volney v. PJCOMN Acquisition Corp.*, No. 10-4119 (D. Minn. June 21, 2012) and *Bass v. PJCOMN Acquisition Corp.*, No. 09-1614 (D. Colo. June 21, 2012) were dismissed pursuant to settlement with a bankrupt defendant.   The settlement papers before the bankruptcy court noted: "Settlement was achieved only after the Debtor filed bankruptcy, and the class members were faced with obtaining an uncollectable judgment." (Doc. 57-4 in *Volney* docket). This is not comparable to the case at bar.

Ultimately, while the Court's analysis is informed by other settlements, a determination as to the reasonableness of *this* settlement is not dependent upon what other judges did in other cases

on other facts. On the record presented, the Court cannot find the terms of the settlement to be reasonable, and cannot find that the terms of the settlement are necessarily *un*reasonable. The point is that the absence of adequate independent representation precludes the analysis necessary to make any finding here. For this reason, it is **respectfully recommended** that the motion be **denied.**

As the Court cannot rewrite the agreement for the parties, should this recommendation be adopted, the District Judge should order the parties to confer and file a status report regarding scheduling the case for trial; the retention of independent counsel for the Arbitration subclass and renewed settlement negotiations; the transfer of Fata's claim and those of his putative subclass to Judge Merryday; or other suggested resolutions.  Leave to file the Third Amended Complaint, which purports to include Fata's claims, should be denied, pending resolution of these matters.

## <u>NOTICE TO PARTIES</u>

A party has fourteen days from this date to file written objections to the Report and Recommendation's factual findings and legal conclusions.  A party's failure to file written objections waives that party's right to challenge on appeal any unobjected-to factual finding or legal conclusion the district judge adopts from the Report and Recommendation.  *See* 11th Cir. R. 3-1.

Recommended in Orlando, Florida on August 5, 2016.

*David A. Baker*
                DAVID A. BAKER
    UNITED STATES MAGISTRATE JUDGE

Copies furnished to:

Presiding District Judge
Counsel of Record
Courtroom Deputy